Ray MARSHALL, Secretary of Labor, United States Department of Labor

v.

The HARTFORD FIRE INSURANCE CO.

Civ. No. H–77–39.

United States District Court, D. Connecticut.

Feb. 10, 1978.

Albert H. Ross, Regional Sol., Jerrold Solomon, U. S. Dept. of Labor, Boston, Mass., for plaintiff.

Judith Kampf, Hartford Fire Ins. Co., Michael S. Wilder, Gen. Counsel, Law Dept., The Hartford Ins. Group, David T. Ryan, Robinson, Robinson & Cole, Hartford, Connecticut, Michael Horne, Covington & Burling, Washington, D. C., for defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

The Secretary of Labor has brought this action against the Hartford Fire Insurance Company ("the Hartford") under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–34. The complaint alleges that the Hartford has willfully violated the Act by terminating, demoting, failing to promote, or otherwise discriminating against 72 of its employees because of their age. 29 U.S.C. § 623(a)(1). The Secretary seeks to enjoin the Hartford from further violations of the Act and to obtain affirmative relief for the alleged victims of discrimination, including reinstatement and back pay where appropriate. The defendant has moved to dismiss the action, or in the alternative for summary judgment, on the ground that plaintiff failed to make adequate efforts to obtain voluntary compliance with the Act before filing suit. Section 7(b) of the Act, 29 U.S.C. § 626(b), which authorizes the Secretary to bring this type of action to enforce the Act, also provides:

> "Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion."

The parties conducted extensive negotiations regarding these alleged instances of discrimination before the complaint was filed on January 31, 1977. The defendant, however, has stated various reasons for concluding that the Secretary's efforts to reach a voluntary settlement were inadequate. In order to measure the Secretary's compliance with the statute, it is necessary to describe the negotiation process in some detail.

### Factual Background

The Hartford employs some 17,000 persons in offices throughout the nation. In January 1976, compliance officers of the Wage and Hour Division of the Department of Labor ("the Department") commenced a full-scale investigation of the Hartford's employment practices. They mailed questionnaires to about 1,400 employees, conducted interviews with past and present employees, and reviewed over 5,800 personnel files at the Hartford's headquarters in Hartford, Connecticut. As the first cases of possible age discrimination were identified, the Department took the position that negotiations in these cases would be premature until it had conducted further investigations and decided whether in its opinion the Hartford had intentionally violated the Act. By September, 1976, the compliance officers had identified 70 possible victims of age discrimination. They concluded that a pattern of age discrimination existed in the Hartford's 50 regional offices, and arranged a conference to discuss these findings and begin negotiations. Before the meeting took place, the Hartford was given the names of eight employees whose discrimination claims were considered to be representative of the larger group. Representatives of the Hartford and the Department met in Boston on October 6, 1976, for their first full-scale negotiations. The Department continued its investigations to identify additional instances of alleged discrimination.

At the October 6 meeting, the Department's representatives gave the Hartford's representatives a list of 74 alleged discrimination victims, including the eight whose names had been provided earlier. This list included each employee's name, date of birth, date of hiring, the date when the Hartford took adverse actions against him or her (e. g., termination or demotion), his or her age at the time of the adverse actions, an estimate of the wages and benefits that he or she would have received up to October 1, 1976, and an estimate of future lost wages and benefits. The negotiators discussed the factors that generally led the Department to draw an inference of age discrimination. The Department's representatives explained the method by which back pay damages are calculated in age discrimination cases: the amount of actual

earnings in the period since discriminatory adverse action is subtracted from the amount the employee would have earned from the defendant employer in the absence of discrimination. Of the eight cases previously mentioned to the Hartford, two were specifically discussed at the first meeting.

Because the claims of a few employees would be barred by the statute of limitations as early as October 20, 1976, the Department asked at the October 6 meeting that the Hartford execute a waiver of the statute of limitations, so that the parties could devote time to their conciliation efforts without filing suit and without eroding any individual claims. The Department proposed a waiver that would be effective for six months. The Hartford's attorneys eventually executed a waiver covering about three months, which expired on January 31, 1977, the day the complaint was filed. In January the Hartford refused to execute an extension of the waiver.

Between October 6 and January 31, the parties' representatives held seven all-day negotiation sessions, two of which carried over to a second day. During part of this period the Department was completing its investigations of defendant's files and identifying additional employee claims. The Hartford expressed dissatisfaction with the continued aggregation of claims, arguing that it could not make "an intelligent, overall response" to the government's accusations until it knew the identity of all alleged discrimination victims. Letter of James E. Reik, Assistant General Counsel, to Jerrold Solomon, December 27, 1976, Attachment 6, Affidavit of James E. Reik, May 23, 1977. The Hartford complained that the Department's negotiators were using vague allusions to unknown numbers of additional claims to unfairly pressure the defendant to make a settlement. On December 28, the Department supplied a list of 18 additional employees.[1] The lists of October 6 and December 28 contain the names of all employees whose claims are involved in this action.

At the negotiation meetings, government representatives repeatedly explained their method of calculating back pay awards, and also pointed out why affirmative relief such as reinstatement was appropriate in some cases. The Hartford took the position that it could not settle individual cases without knowing the exact amount of back pay that the Department claimed for each employee. The Department argues that it was nearly impossible to compute the exact amount of back pay owed to all employees, because that computation required an up-to-date record of each employee's actual earnings from other employers. It proposed to ascertain the amounts of actual earnings, so that damages could be calculated, *after* the Hartford had acknowledged liability and had agreed on a method for computing damages. To research actual earnings before defendant had agreed to pay damages would be unduly burdensome and premature.

Though most of the individual cases were discussed at these meetings, the negotiation process was found by both parties to be extremely frustrating. When particular cases were brought up, the Hartford would frequently ask for more information, complaining that the Department had offered no substantiation for its claim of age discrimination. The Department's representatives apparently inferred that an adverse action against an employee between the ages of 40 and 65, *see* 29 U.S.C. § 631, was motivated by age discrimination when the Hartford's files showed a good employment record and no other reasons for the adverse action were apparent. They perceived a pattern of adverse actions against persons in the protected age group, which bolstered these inferences. The Hartford, however, requested affirmative evidence of discriminatory motives. Discussion of individual cases was often halted so that the Department could provide further evidence of discrimination at a subsequent meeting.

---

1. This list included data corresponding to that of the October 6 list, but it also identified the specific type of adverse action involved and stated the positions and locations at the time of the adverse actions. It did not include estimates of total lost wages and benefits.

Sometimes after hearing the government's allegations, representatives of the Hartford said they had to conduct their own investigation before making any response. At a later meeting the Hartford sometimes presented information tending to show other reasons for the adverse actions discussed. Even where there was tentative agreement that a particular claim was valid or invalid, settlement was delayed because it required the approval of superior officials on both sides who were not present at the meetings.[2]

The parties have provided the court with concise summaries of the progress of these discussions as of the time the complaint was filed. The plaintiff has noted that five employees were each discussed on four separate occasions, and 18 on three separate occasions, after the initial meeting. Affidavit of Merle D. Hyman, July 6, 1977, at 3. In its Statement of Material Facts As To Which There Is No Dispute, and in the affidavits of James E. Reik (May 23 and June 7, 1977), the defendant has supplied the following breakdown of the 92 cases on the October 6 and December 28 lists: Department representatives had agreed to withdraw their claims as to 20 employees, whose names were not attached to the complaint. In 18 cases, the Hartford had offered some evidence favorable to its position and was awaiting some response from the Department. In 22 cases the Hartford had heard the Department's allegations but had not yet responded to them. In nine cases, both sides had presented their positions but discussions had not progressed to a point of impasse.[3] Nine other cases were more or less fully discussed.[4] Fourteen cases were never discussed, though they had been placed on the agendas of the last four meetings.

Each party asserts that the difficulty in negotiating these claims is primarily the fault of the other party. The Hartford argues that it could not settle claims for back pay without knowing the exact amount it would have to pay each employee, and it claims that the Department never presented any real evidence of discrimination. According to the Hartford, plaintiff's representatives concentrated their initial efforts on obtaining a waiver of the statute of limitations and then made little effort to proceed with negotiations once the waiver was signed. In particular, the Hartford says it tried to arrange negotiation meetings in November, but failed because the Department's representatives were too busy with other matters.

Plaintiff points to the fact that the Hartford never made a concrete settlement offer in a single case, whereas the Department was willing to withdraw 20 claims in response to evidence presented by the Hartford. According to plaintiff, defendant maintained an outward posture of conciliation when in fact it was unwilling to concede anything. Representatives of the Hartford continually refused to proceed with individual cases until they had an opportunity to re-check their files and confer with superiors. Plaintiff also says that defendant's representatives insisted at each meeting on going over cases that had previ-

---

2. Some time was also devoted to discussing the Department's claim that a pattern of age discrimination existed for certain types of positions, a claim based on statistical data rather than individual adverse actions. This claim is not involved in the present action.

3. In the words of an attorney for the Hartford, "neither side had taken a firm position that further discussions and serious negotiations would be unproductive." Affidavit of James E. Reik, May 23, 1977, at 4.

4. In two of the nine cases, plaintiff's representatives had agreed to recommend to their superiors that the claims be dropped. They had indicated that three other claims could be ex-

cluded from any comprehensive voluntary settlement, but would be pressed in any subsequent litigation. In one case, a settlement offer by the Hartford was considered possible. In the remaining three cases, the Hartford's representatives had indicated their probable willingness to rehire the employees, but had made no firm commitments. As to these three cases, the Hartford says that "it should have been clear that conciliation could have been successfully completed but for the filing of the Complaint." Memorandum In Support, at 6. It is not clear why defendant asserts that the filing of the complaint precluded further settlement efforts.

ously been discussed, thus making it impossible to devote some discussion to every case.

## I.

Defendant argues that plaintiff has not fulfilled the mandate of § 7(b), relying on three asserted deficiencies in the pre-complaint negotiations: (1) plaintiff did not inform defendant of the exact amount of back pay damages claimed for each employee; (2) plaintiff did not furnish defendant with reasons for concluding that there had been discrimination in each case; and (3) plaintiff did not fully discuss each employee's case with defendant to a point where it was clear that no voluntary settlement could be achieved. Defendant argues that the § 7(b) requirement is jurisdictional and that plaintiff's action must therefore be dismissed; in the alternative, that the circumstances warrant dismissal in the discretion of the court. Plaintiff contends that his conciliation efforts were adequate; but if they were not, he argues that the proper remedy is not to dismiss but to stay the action to allow further negotiations.

The question whether § 7(b) poses a jurisdictional requirement for actions brought by the Secretary has divided other courts,[5] but I find that the Secretary's representatives have complied with § 7(b) and therefore do not reach that issue.

The prior case law construing § 7(b) may be readily summarized. In *Brennan v. Ace Hardware Corp.*, 495 F.2d 368 (8th Cir. 1974), the court of appeals held that three things must be accomplished before suit is filed: (1) the employer must be told what the Secretary desires and what the Act specifically requires of him; (2) he must be informed that litigation may follow if the matter is not voluntarily resolved; and (3) he must be given an opportunity to respond, at least orally, to the Department's charges. Whether the Secretary has fulfilled these

obligations is to be determined on the facts of each case. *Dunlop v. Resource Sciences Corp.*, 410 F.Supp. 836, 840 (N.D.Okl.1976).

■ In the *Ace Hardware* case, the Department failed to satisfy the court's first requirement because the employer was not informed that back wages were recoverable. 495 F.2d at 375. In another case, the Department failed to disclose the number of alleged discrimination victims or identify them by name, and thus inadequately informed the employer of the relief being sought. The court reasoned, "In the absence of a determination of the exact extent of the violations, common sense dictates that there can be no conciliation, conference or persuasion, as required by the Act." *Usery v. Sun Oil Co. (Delaware)*, 423 F.Supp. 125, 129 (N.D.Tex.1976). Full notice of a claim involving one employee cannot satisfy the Act with respect to other employees' claims. *Brennan v. Sun Oil Co. of Pennsylvania*, No. 74–C–474–B, slip op. at 15 (N.D.Okl., filed Nov. 3, 1976). It has also been held that the Department must "demonstrate the validity of its claim" of discrimination, even when the supporting information is in the defendant employer's files. *Dunlop v. Sandia Corp.*, 13 Fair Empl.Prac.Cas. 128 (D.N.M.1975). Several courts have emphasized long delays by the Department in initiating conciliation discussions as a ground for dismissing or staying actions under § 7(b). *Usery v. Sun Oil Co. (Delaware), supra*, 423 F.Supp. at 129–30; *Brennan v. Sun Oil Co. of Pennsylvania, supra; Dunlop v. Sandia Corp., supra.*

■ The Secretary clearly has the burden to initiate conciliation and must satisfy § 7(b) even if the employer is recalcitrant, but the degree of effort required of the Secretary depends on the employer's reaction to his approaches. *See Dunlop v. Sandia Corp., supra.* An employer's refusal to cooperate in the investigation stage by al-

---

5. *Compare Usery v. Sun Oil Co. (Delaware),* 423 F.Supp. 125, 128 (N.D.Tex.1976); *Dunlop v. Resource Sciences Corp.,* 410 F.Supp. 836, 842 (N.D.Okl.1976) (requirement is jurisdictional) *with Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 376 (8th Cir. 1974) (district court

could have stayed action instead of dismissing) (dictum); *Brennan v. Texas Instruments, Inc.,* 12 Empl.Prac.Dec. ¶ 10,983, 12 Fair Empl.Prac. Cas. 1724 (E.D.Ky.1976); *Dunlop v. Sandia Corp.,* 13 Fair Empl.Prac.Cas. 128 (D.N.M. 1975) (staying actions).

lowing the Department access to its personnel files does not affect the Secretary's duty to conciliate. The Secretary has the power to subpoena an employer's records under 15 U.S.C. § 49; and the duty to conciliate arises after the investigation is completed and the Department has determined that the Act has been violated. *Dunlop v. Resource Sciences Corp., supra,* 410 F.Supp. at 840–41. But if an employer "openly disagree[s] with the [Department's] findings and refuse[s] to conciliate" after being properly informed of the requirements of the Act, the Secretary has no further duty to conciliate. *Usery v. Sun Oil Co. (Delaware), supra,* 423 F.Supp. at 129.

## II.

■ In *Ace Hardware, supra,* the court concluded generally that "the Secretary must initially use exhaustive, affirmative action to attempt to achieve conciliation before legal action is begun." 495 F.2d at 374. The Hartford places great emphasis on the word "exhaustive," and urges that "Congress intended litigation to be only a step of last resort after the Secretary had exhausted *every possible means* of informally resolving allegations of age discrimination in employment." Memorandum in Support, at 2 (emphasis added). The statute, however, does not use the word "exhaustive." In *Ace Hardware,* the word was borrowed from a passage in a committee report summarizing the provisions of the Act. 495 F.2d at 374, *quoting* H.R.Rep.No. 805, 90th Cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 2213, 2218.[6] It is the statute that courts must construe, and the legislative history should be consulted only to resolve ambiguities in statutory language. *See, e. g., Guarriello v. United States,* 201 Ct.Cl. 129, 475 F.2d 640, 642 (1973); *American Community Builders, Inc. v. CIR,* 301 F.2d 7, 13 (7th Cir. 1962). I do not believe that the "exhaustive" efforts standard articulated in *Ace Hardware* should be adopted by this court.

Especially in an action where many individual claims are involved, such an approach would pose Herculean tasks for the Department and effectively deny access to the courts under the Act. It is almost always possible to argue that some possible method of conciliation or persuasion was not "exhausted." The three specific requirements set forth in *Ace Hardware* are valid, but a general standard of reasonableness should apply. If the three requirements are satisfied, and if the Secretary has endeavored in good faith to obtain voluntary compliance through efforts that were reasonably thorough under all the circumstances, then he has complied with § 7(b).

## III.

■ "In order for the Employer to comply voluntarily with the Act, he must know specifically what the Secretary desires him to do." 495 F.2d at 375. The Hartford argues that the Department failed to fulfill this first requirement because it did not state the exact amount of back pay damages claimed for each employee. In *Ace Hardware,* however, the employer was never told that his employee was entitled to *any* back pay under the Act. Here the Department's representatives told the Hartford which remedies were sought in each case, described the method of computing back pay, and in most cases provided an estimate of total benefits lost from the Hartford. From this information defendant could roughly estimate the damages claimed.

More importantly, the Department's negotiators were prepared to calculate exact damage figures in any case where the Hartford acknowledged its liability. This is important because the purpose of the first requirement is to facilitate *compliance.* So long as the Hartford refused to concede liability, the lack of precise figures did not prevent it from reaching a settlement. If

---

**6.** The passage quoted is as follows:

"It is intended that the responsibility for enforcement vested in the secretary by section 7, be initially and exhaustively directed through informal methods of conciliation, conference and persuasion and formal methods applied only in the ultimate sense."

the Hartford had agreed to pay damages to an employee and proceeded to negotiate over the amount of damages, the Department should then have been prepared to claim a specific amount; and there is every indication that it would have been so prepared. While the employer firmly contests liability, the work of calculating exact damages would be a wasted effort, for the data concerning projected and actual benefits would have to be updated at the time of trial.

### IV.

■ Defendant claims that before filing suit, the Secretary must tell an employer the exact nature of the discrimination with which he is charged and provide information supporting the charges. Unless he knows exactly what is charged and the facts supporting the charges, it is argued, the employer has no real opportunity to respond to the charges, and the third *Ace Hardware* requirement has not been satisfied.

This argument has two prongs, and defendant has failed to distinguish them. The first is that an employer should know the *nature* of the charges against him, which is no doubt correct. If plaintiff's representatives had not identified the alleged discrimination victims or indicated what the Hartford had done to discriminate against them, the Hartford would have no means of responding. *See Usery v. Sun Oil Co. (Delaware), supra.* According to the Hartford, the exact nature of the discrimination charged was never disclosed in most of these 72 cases. But this confuses the nature of an allegation with the evidence supporting it. The nature of the charges was that the Hartford took specified adverse actions, resulting in economic loss, against particular employees at specified times, and that these actions were taken because of their age. In each of the 72 cases, the Hartford received this information, either orally or in writing.

■ The second proposition is that the Department must provide the employer with some unspecified quantum of evidence to support its allegations. Yet the Hartford has not indicated what specific type of evidence it desired to hear. It seeks to enlarge the *Ace Hardware* requirement that employers be given an opportunity to respond to charges by adding a vague and threatening requirement of proof to support those charges at the conference table. Although a careful presentation of evidence to the employer could obviously increase the likelihood of a voluntary settlement, I do not think § 7(b) requires the Secretary to meet any burden of proof in pre-complaint negotiations.

The court in *Dunlop v. Sandia Corp., supra,* said that the Department must "demonstrate the validity of its claim" to the employer at the conference table, but I cannot agree.[7] To allow the employer an opportunity to answer its allegations, the Department should reveal its basis for making them, even though that basis is only circumstantial evidence. But the Secretary has no obligation to "prove" to the employer that he has committed acts of discrimination. Even at trial, a prima facie case of intentional employment discrimination can be made by raising inferences from circumstantial evidence. The burden then shifts to the defendant employer to show a nondiscriminatory reason for his action. Thus a plaintiff need not always prove discriminatory intent. *See, e. g., McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (race discrimination); *Peters v. Jefferson Chemical Co.,* 516 F.2d 447, 449–50 (5th Cir. 1975) (sex discrimination). Standards of proof should not be imposed on the "informal methods of conciliation" required by § 7(b); and the

---

7. The *Sandia* case can also be distinguished. There the court described the Secretary's negotiating position as "similar to auction bargaining in the street markets rather than conciliation through the explanation of the factual basis of his position and the manner in which his conclusions were drawn." 13 Fair Empl.Prac. Cas. at 128. Here the Department described to defendant the manner in which its conclusions were drawn and supplied defendant with facts adequate to allow the formulation of responses.

Department need not prepare for negotiation sessions as it would for a trial. Once the Department has identified the adverse actions alleged to be discriminatory, the employer can determine himself through his own investigations whether the employee's record and other circumstances suggest other explanations for the action taken.

## V.

■ Lastly, defendant urges that § 7(b) requires full discussion of each employee's case before a complaint may be filed. There is some support for this proposition in *Usery v. Sun Oil Co. (Delaware), supra,* where the court granted summary judgment for the defendant employer as to all employee claims, excepting two claims that the employer had specifically refused to discuss. But in that case the Department made no attempt to discuss any of the other claims with defendant, though 19 months elapsed between the last meeting with defendant and the filing of the complaint. In this case, several all-day meetings were held, where the Department's representatives were ready and willing to discuss all of the cases, and the complaint was not filed until the latest possible date before any claims would be time-barred.[8]

The Department claims that defendant's "dilatory tactics" prevented the negotiators from discussing 14 cases at the parties' last four meetings. Hearing on Motion, Tr. at 12. It emphasizes that defendant never agreed to settle any employee's case; it reacted to all discussion with a "sphinx-like attitude . . . to the effect that 'you haven't yet convinced us that we have . . ever practiced age discrimination.'" Tr. at 14. In sum, plaintiff contends that defendant's representatives talked endlessly about individual cases, maintaining an appearance of eagerness to identify cases of discrimination and remedy them, but stubbornly refusing to acknowledge discrimination in any case. After many cases have been discussed in this manner, plaintiff argues that further conciliation efforts would be fruitless; therefore, he argues, § 7(b) does not require that the remaining cases be discussed before litigation commences.

The Department perceives a pattern in defendant's responses to the government's charges of discrimination, as well as a pattern of discriminatory employment practices. This action, however, is based on individual instances of alleged discrimination; at trial, each employee's case must be judged on its own merits. In their negotiations, the parties may find it more convenient and constructive to deal with several cases at once, perhaps to negotiate lump-sum settlements for a group of alleged victims. Such negotiations would not offend the letter or the spirit of the Act. But if he prefers to respond to charges on a case-by-case basis, the employer should have an opportunity to do so. He must have time to conduct internal investigations and formulate responses to individual charges, as well as some opportunity to present his responses in negotiations.

The Department must therefore inform the employer of the nature of all charges while time remains to formulate responses. Its representatives must be prepared to discuss every case, and the time made available for negotiations must be reasonably adequate to allow some discussion of every case. But if the time allowed for discussions is adequate, § 7(b) does not require that every case actually be discussed. If the courts adopted such a rule, defendants could avoid their obligations under the Act by prolonging the discussion of a few cases. The appropriate issue under § 7(b) is not whether all cases were discussed, but whether the defendant had a reasonable opportunity to negotiate in all the cases.

---

**8.** If defendant had not executed a waiver of the statute of limitations and the complaint had been filed in October 1976, the pre-complaint negotiations would obviously have been much less extensive. But in ruling on this motion the court must evaluate the conciliation efforts made before the complaint was actually filed.

The fact that defendant waived the statute of limitations and thus allowed more time for pre-complaint negotiations does not affect that evaluation. Similarly, the Hartford's refusal to execute a further waiver, which it had no obligation to do, has no effect upon the court's decision.

Here, defendant was given information concerning all charges by December 28, 1976. There were nearly ten full days of negotiations. It is reasonable to expect that the negotiators could have considered 92 incidents of alleged discrimination in those meetings. This does not mean that the Department could not have made a better effort to complete its discussions with defendant. But if defendant had endeavored to use the time more wisely, there could have been some discussion of every case.

Though the Department did not arrange to begin discussions with defendant at the earliest possible time, it was justified in waiting until its investigations had revealed a substantial and representative group of claimants. The Hartford also expressed its reluctance to negotiate before all alleged discrimination victims had been identified. Letter of James E. Reik, to Jerrold Solomon, *supra.* The Department's representatives were not available to meet at all times, but some allowance must be made for the many other tasks that occupied their attention during this period.

The nature of the employer's response is relevant in evaluating the Secretary's efforts to conciliate. *See Dunlop v. Sandia Corp., supra.* Here the Hartford consumed many hours arguing with the Department about its requests for exact computations of back pay damages and evidence of discrimination. These arguments may have been made in good faith, but they did not serve to expedite the settlement process. It is significant that the negotiations were not producing any concrete results, even though the parties had not "agreed to disagree" in very many cases. The Hartford refused to enter any definite settlement agreements after ten days of negotiations; the Department should not be expected to assign high priority to scheduling further discussions when the first ten days produced only frustration. If the Hartford had settled some cases and demonstrated its willingness to settle others, the argument that the Department should have held more meetings would be far more compelling.

Taking all of these circumstances into consideration, I find that the Hartford was afforded an adequate opportunity to respond to all charges and negotiate possible settlements. The Department did not do everything in its power to effect voluntary compliance, but it made a sincere and reasonable effort to negotiate at length with defendant. Section 7(b) was satisfied when the complaint was filed.

## VI.

The fact remains, however, that discussions in many of these cases are incomplete. I believe the court can best serve the purposes of the Act by exercising its discretion to stay discovery in this action for 90 days, so that the parties may conduct further discussions without resorting to the formalities of discovery. The Hartford has claimed that further discussions would be helpful. It would only waste the resources of both parties to file and answer interrogatories and conduct depositions in cases that could be settled at the conference table. The Hartford may be much better prepared to reach binding settlements now than it was before this motion was heard. So long as its stance was that it might obtain a dismissal of the entire action with prejudice, there was little pressure on defendant to concede anything. Now the Hartford must face the reality of this lawsuit and make its choice in each case to settle or litigate. A stay of discovery will allow both parties an even better opportunity to settle their differences informally than is contemplated by § 7(b).

## VII.

Having been informed that the court would stay discovery to allow further negotiations, the Hartford has asked the court to supervise these negotiations by ordering the Department to provide a compu-

tation of the exact amount of back pay owed to each employee and "the specifics which the Government believes will substantiate its allegations of age discrimination" in each case. Further Memorandum On Behalf of Defendant, at 1–2. I have held above that § 7(b) does not require the Department to provide this data before the complaint is filed, and I will not require it while the stay is in effect. The Department should be prepared to state a figure for back pay liability for a given employee once the Hartford has committed itself to pay such damages to that employee. If the Hartford is dissatisfied with the evidence submitted by the Department to support an inference of age discrimination, it may test the Department's case at trial.

The Hartford argues that it is reasonable to require this information because the Department could be required to provide it in response to interrogatories. But the purpose of staying discovery is to avoid its formalities and allow the parties to further pursue the "informal methods of conciliation" contemplated by § 7(b). The parties should be able to conduct their negotiations without interference from the court.

The motion to dismiss and/or for summary judgment is denied. All discovery is stayed for a period of 90 days following the date of this memorandum. When 90 days have elapsed, each of the parties shall file with the court a report describing the progress of negotiations since the argument on this motion.

SO ORDERED.